IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>             Respondent,<br><br>        v.<br><br>SHANE MARSTON,<br><br>             Appellant. | No. 84973-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — Shane Marston appeals from a jury conviction for residential burglary, obstructing a law enforcement officer, two counts of misdemeanor violation of no-contact order, and one count of tampering with a witness. The jury also found that the State had proved that the burglary and violation of no-contact order counts were crimes of domestic violence. Marston raises evidentiary challenges based on phone calls that were admitted at trial, including the fact that no instruction was issued to jurors explaining their role as fact finders in assessing the alleged adopted admissions in a recorded jail phone call. The trial court properly admitted the 911 call Marston now contests, but erred when it failed to instruct the jury regarding the alleged adoptive admissions in the challenged jail call. The failure to instruct the jury requires reversal of two of the crimes of conviction for which the State utilized this evidence. Affirmed in part, reversed in part, and remanded.

FACTS

On July 4, 2022, an incident occurred between Shane Marston, Jessica Ramsey, and Gavin Minden that resulted in Ramsey calling the police. Officers from the Seattle Police Department (SPD) responded to the call, but Marston was gone by the time they arrived. Marston returned to the house later that night and law enforcement was contacted again. SPD K9 units eventually led officers to Melanie Engle's backyard where Marston was found roughly 40 feet up in a tree.

Marston was ultimately charged with burglary in the first degree, residential burglary, felony violation of a no-contact order, assault in the fourth degree, obstructing a law enforcement officer, two counts of misdemeanor violation of a no-contact order, and two counts of tampering with a witness. The charges of burglary in the first degree, residential burglary, and violation of no-contact order were all designated as domestic violence offenses based on Marston's intimate relationship with Ramsey. Among the evidence admitted at trial were the two phone calls at issue in this appeal: a 911 call made by Engle on the night of the incident, and a call Marston made to Ramsey from the King County Jail where he was incarcerated shortly after his arrest in this case. Neither Ramsey nor Engle testified at trial. To authenticate them, the State relied on testimony from the officers who responded to the 911 call, an officer who is the custodian of the jail calls, and the contents of each call. The court admitted the calls over objections from Marston.

The jury found Marston guilty of residential burglary, obstructing a law enforcement officer, two counts of misdemeanor violation of a no-contact order,

and one count of tampering with a witness. The jury acquitted Marston of burglary in the first degree, felony violation of a no-contact order, assault in the fourth degree, and one count of tampering with a witness. The court opted against a standard range prison sentence and instead imposed a prison-based Drug Offender Sentencing Alternative that required Marston to serve the first half of his sentence on the felony convictions in prison, followed by an equal term of community custody supervision by the Department of Corrections, and completion of various treatment requirements.

Marston timely appealed.

ANALYSIS

I. 911 Call

Marston first claims the trial court erred in admitting the 911 recordings, arguing the State failed to properly authenticate the calls. The standard of review for a trial court's decision on the authenticity of proffered evidence is abuse of discretion. *State v. Payne*, 117 Wn. App. 99, 110, 69, P.3d 889 (2003). "A trial court abuses its discretion when a decision is 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. Howland*, 180 Wn. App. 196, 204, 321 P.3d 303 (2014) (internal quotation marks omitted). "A decision is based on untenable grounds if the court relies on an incorrect legal standard or does not correctly apply the law." *State v. Hill*, 6 Wn. App. 2d 629, 640, 431 P.3d 1044 (2018).

In order for a trial court to admit a recording as evidence, the party introducing it must identify or authenticate it. *State v. Williams,* 136 Wn. App. 486,

499-500, 150 P.3d 111 (2007). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." ER 901(a). "Because the proponent must make only a prima facie showing of authenticity, ER 901 is met if the proponent shows enough proof for a reasonable fact-finder to find in favor of authenticity." *Payne*, 117 Wn. App. at 109.

When voices are recorded, the individuals speaking must be identified. ER 901(b)(5); *Williams*, 136 Wn. App. at 500. "The identity of a party may be established by direct or circumstantial evidence." *State v. Danielson*, 37 Wn. App. 469, 471, 681 P.2d 260 (1984). Direct identification of voices by an actual participant in the recorded conversation is not required. *Williams*, 136 Wn. App. at 500. The contents of a proffered phone conversation can provide sufficient evidence of identification and authentication. *Danielson*, 37 Wn. App. at 471.

Engle was not present at trial to testify, so neither the court or jury were able to compare her voice to that on the recorded call. Nonetheless, there was enough circumstantial evidence to authenticate the 911 recordings.

Marston argues in his opening brief that, under *State v. Jackson*,[1]

> the party proffering the phone conversation *must* call a foundational witness to testify (a) that the witness has personal knowledge of the events recorded on the tape; (b) that the witness listened to the tape and compared it with those events; (c) . . . that the tape accurately portrays those events[, and] [i]f the tape records human voices, the foundational witness must identify those voices.

(Emphasis added.) However, Marston mischaracterizes the holding of *Jackson*. While the court in *Jackson* affirmed the method of authentication advocated for by

---

[1] 113 Wn. App. 762, 766-67, 54 P.3d 739 (2002).

Marston, it also explained that "[t]his method is not exclusive, and a proponent may also use any other that produces evidence sufficient to support the basic findings of identification and authentication." 113 Wn. App. at 769. Thus, *Jackson* does not stand for the proposition that deviating from Marston's desired method of authentication is an abuse of the trial court's discretion. Rather, *Jackson* supports a wide range of identification methods depending on the facts of each case.[2]

Marston avers that the admission of the 911 call prejudiced him because it was used to convict him of obstruction. However, even without the admission of the call, the admission of body-worn camera footage from that night showed Marston up in the tree in Engle's backyard refusing to cooperate with authorities. That evidence was corroborated by testimony from SPD officers who responded to the scene.

The combination of Engle's self-identification during the 911 call and other circumstantial evidence supports the trial court's finding that the call at issue was authentic. In the call, the speaker indicated her name is Melanie Engle. Engle gave the 911 operator her address and phone number. She described where her townhouse was situated in relation to where SPD units were out searching. During the call, Engle stated, "[H]e jumped over the fence. It's difficult to get into my backyard . . . he had to have jumped over many fences to get where he's at. . . . There's police lights flashing." Engle talked about officers searching around

---

[2] For example, the court in *Jackson* describes cases from our state Supreme Court where it "held that a tape can be authenticated by showing (1) that the recording machine was 'capable of taking testimony,' (2) that its operator was 'competent to operate it,' (3) that the resulting record is authentic and correct, (4) that the resulting recording has been preserved without changes, deletions, or additions, and (5) the identity of each relevant speaker." 113 Wn. App. at 767 (internal quotation marks omitted) (quoting *State v. Williams,* 49 Wn.2d 354, 360, 301 P.2d 769 (1956)).

her backyard with flashlights multiple times throughout the call. Engle told the 911 operator the man in her yard was standing "next to [her] tree, and he d[id]n't have a shirt on." Engle moved away from the window worried she would be seen by the person in her yard and lost sight of him. At the conclusion of the 911 call, Engle indicated she was going to give officers permission to access her backyard through her residence.

The statements made on the 911 call were corroborated by other circumstantial evidence at trial. SPD Officer Jeremy Weiss testified he "jump[ed] multiple fences prior to finding the suspect." SPD Sergeant Adam Beatty[3] testified that "officers were using their flashlights" when trying to get Marston to come down from the tree. Likewise, Weiss described "a very large tree" where the officers "eventually saw the suspect." Portions of Weiss' body camera footage from the incident were also admitted at trial. In the video, police are seen shining flashlights into a tree at Marston, who is not wearing a shirt. The footage shows officers trying to convince Marston to climb down, with some officers standing in the backyard of a home. These officers appear to have entered the yard through the home via a sliding door which was standing open.

The 911 call was properly authenticated: Engle self-identified and the contents of her call were corroborated by testimony at trial from SPD officers who were present at her residence on July 4, which provided circumstantial evidence that the call was authentic. The trial court did not abuse its discretion when it admitted the 911 call.

---

[3] Beatty was a patrol officer at the time of the incident but a sergeant when he testified at trial.

II.     Jail Call

Like the 911 call from Engle, Marston argues that the jail phone call was not properly authenticated.[4]  However, as with the other call, a combination of self-identification and circumstantial evidence support the trial court's finding that the jail call was authentic.  Trial testimony from Sergeant Fred Graves, a corrections sergeant at the King County Jail, established that there are several mechanisms in place that incarcerated people must use in order to make a call from the jail.  Graves explained that individuals must use their "booking of arrest number" and a PIN[5] that is meant to be kept secret.  The unique numbers allow prison officials to track which incarcerated person is making a call, and who they are contacting.  Additionally, he noted that when individuals incarcerated at the King County Jail first use the phone system there, they are prompted to submit samples of their voice so that each subsequent call they make can be verified through biometric technology.  Although Marston did not directly identify himself by name in the recorded call at issue, the testimony from Graves indicates that Marston had to enter multiple pieces of self-identifying information in order to make the call that was ultimately recorded and saved to his file.

Although neither Marston nor Ramsey testified at trial, the jail phone call was one of a number of recordings of their voices that were admitted and played for the jury.  Two 911 calls Ramsey made during the incident were admitted, as

---

[4] Marston also avers that the jail call was admitted as a business record.  The State correctly notes that was not a basis for admission found by the trial court.  Accordingly, we need not consider Marston's argument on this point.

   The State further concedes use of the term "res gestae," by itself and the trial court, in considering admissibility of the jail call was a misapplication of that doctrine.  Because res gestae does not actually appear to have been a basis for admission, no further analysis is required.

[5] Personal identification number.

well as body camera footage from SPD officers responding to each of her calls. Marston's voice can be heard on separately admitted body camera footage after Engle's 911 call, when he indicated that he was unwilling to come down from the tree in her yard. With that additional evidence, the court was able to compare Marston and Ramsey's voices across different recordings. The contents of the conversation in the recorded jail call provided other circumstantial evidence that tended to show its authenticity. For example, Marston refers to spending hours in a tree and accuses Ramsey of "defending [Minden] over [him]." Ramsey talks about the actions of her dog, just as she did on her 911 call and in bodycam footage from officers responding to her call, both of which were played at trial, and Marston references the injury he sustained from her dog. Therefore, the trial court did not abuse its discretion when it found that the jail call was properly authenticated.

### A. Adoptive Admissions

Marston also asserts that Ramsey's statements in the jail call were inadmissible hearsay. He argues the trial court erroneously found that Marston adopted Ramsey's statements. We review a trial court's decision on the admission of evidence for abuse of discretion. *State v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). "Hearsay" refers to an out-of-court statement of a declarant that is offered to prove the truth of the matter asserted. ER 801(c). "Hearsay is not admissible except as provided by [the] rules [of evidence]." ER 802. One such exception to the general prohibition on hearsay is an admission adopted by party-opponents. ER 801(d)(2)(ii). An adoptive admission is a statement by another that the opposing party "has manifested an adoption or belief in its truth." *Id*. In

other words, a party can adopt the statements of another, either expressly or implicitly, rendering the statement admissible. "A party can manifest adoption of a statement by words or gestures. A party can also manifest adoption of a statement by complete silence or acquiescence." *State v. Hill*, 6 Wn. App. 2d 629, 640-41, 431 P.3d 1044 (2018) (citation omitted).

The trial court's finding that Marston adopted Ramsey's statements in the challenged jail phone call was not erroneous. The judge relied on correct legal standards and correctly applied the law. The trial court found that "there's sufficient evidence in looking at the context of th[e] call to establish that the statements made by Mr. Marston are admissible as party opponent admissions under 801(d)(2), and so they are admissible." To support this decision, the trial court judge reviewed the call transcript and identified several lines where Marston replied to accusations made by Ramsey. Rather than denying the truth of Ramsey's statements, Marston's replies tended to dispute his intent behind the actions of which Ramsey accused him of during the phone call.[6] The court specifically relied on that fact to conclude that the statements made by Ramsey were admissible as statements of a party-opponent.

---

[6] For example, reading from the call transcript, the trial court stated, "Ramsey indicated, 'You don't slap a girl in the face,' . . . 'you slapped me in the face twice.' . . . 'on my cheek,' . . . [a]nd Mr. Marston . . . says something about 'playing around with an' unintelligible 'chocolate. I was just playing like, ha-ha, I got through your defenses. I know, cause you're always like, I could have killed you, I could have killed you.' That suggests that Mr. Marston acknowledged being offensive to get through Ms. Ramsey's defenses. And he's acquiescing or assenting to her assertion that she was slapped."

1.      Jury Instruction

However, even where there are sufficient foundational facts for a judge to admit statements as adoptive admissions, such a determination by the court is only preliminary in nature; it is ultimately the responsibility of the jury to determine whether the defendant heard, understood, and acquiesced in the accusatory statement. *Hill*, 6 Wn. App. 2d at 646. "Whether an accused has made an adoptive admission is thus a matter of conditional relevance to be determined ultimately by the jury." *State v. Neslund*, 50 Wn. App. 531, 551-52, 749 P.2d 725 (1988). This court has previously held that "the proponent of adoptive admissions must submit and the court must give an instruction to the jury that informs the jury that it cannot consider the [statements] as evidence unless it finds under the circumstances that the defendant heard, understood, and acquiesced in the statements." *Hill*, 6 Wn. App. 2d at 647. Although the State alluded to the jury's role to weigh the adopted admissions at trial here, counsel failed to propose or request a jury instruction.[7] Failure to provide an instruction to the jury as to the adoptive admissions was error.

2.      Harmless Error

Because the failure to provide an instruction to the jury alone is not a constitutional issue, we analyze the error under the nonconstitutional harmless error standard. Constitutional and nonconstitutional errors can be subject to the harmless error standard. *State v. Kindell*, 181 Wn. App. 844, 853, 326 P.3d 876 (2014). Constitutional errors infringe on an individual's constitutional rights and

---

[7] During argument on the admission of this call, the prosecutor stated, "It's for the jury to decide and give weight appropriately as to whether or not it, in fact, was a joke."

- 10 -

are presumed prejudicial. *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007).

Under the nonconstitutional harmless error standard, this court must reverse if the error was prejudicial. *State v. Matamua*, 28 Wn. App. 2d 859, 876, 539 P.3d 28 (2023). An evidentiary error is prejudicial when, within reasonable probabilities, the outcome of the trial would have been different had the error not occurred. *State v. Wade*, 98 Wn. App. 328, 338, 989 P.2d 576 (1999).

Marston was convicted of residential burglary, obstructing a law enforcement officer, two counts of misdemeanor violation of a no-contact order, and one count of tampering with a witness.[8] Ramsey did not testify at trial. Without the admission of the jail call, the State would be left with little evidence of the conduct discussed in that phone conversation as the SPD officers who testified at trial arrived on scene *after* the events the State later relied upon to file some of the felony charges had occurred[9] and, without direct knowledge, the officers could not testify about them with specificity. Accordingly, there is a reasonable probability that, with an instruction limiting the use of this evidence, the jury would have come to different conclusions on some of the allegations faced at trial.

The record is clear, however, that the evidence relied upon for count 5, obstructing a law enforcement officer, count 7, tampering with a witness, and count 9, misdemeanor violation of a no-contact order, was unrelated to the evidence

---

[8] Marston was acquitted of burglary in the first degree, felony violation of a no-contact order, assault in the fourth degree, and a separate count of tampering with a witness. As such, jeopardy has attached to these counts and they are not subject to retrial. "Double jeopardy bars appeal and retrial when the defendant has been acquitted." *State v. Karpov*, 195 Wn.2d 288, 293, 458 P.3d 1182 (2020).

[9] Tampering with a witness is a class C felony. RCW 9A.72.120(2). The two such charges Marston faced were alleged to have occurred months after the date of his arrest.

challenged on appeal. In closing argument, the State highlighted the SPD body footage camera and Weiss' testimony in support of its charge of obstructing a law enforcement officer, Marston's communication with his friend in August and September 2022 as conclusive of its tampering with a witness allegation and the misdemeanor violation of a no-contact order set out in count 9. As such, Marston does not establish prejudice as to these convictions based on the instructional error regarding adoptive admissions. We affirm the convictions in counts 5, 7, and 9, but reverse those for counts 2 and 6 and remand.[10]

III.     Victim Penalty Assessment

Marston avers the court erred in imposing the victim penalty assessment (VPA), which was mandatory at the time he was sentenced, despite his indigency. The State does not agree that the VPA is a "cost" captured by the applicable statutory amendments that went into effect after sentencing but does not dispute Marston's indigency or object to remand for the trial court to strike this legal financial obligation. We have repeatedly held that the amendments to RCW 7.68.035 apply to cases pending on appeal when the statutory changes went into effect. *See State v. Phillips*, 6 Wn. App. 2d 651, 677, 431 P.3d 1056 (2018); *State v. Wemhoff*, 24 Wn. App. 2d 198, 201, 519 P.3d 1056 (2022); *State v. Ellis*, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023); *see also State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). Accordingly, we remand for the trial court to strike the VPA from the judgment and sentence.

---

[10] In his pro se statement of additional grounds for review, Marston presents a confrontation challenge regarding the State's failure to introduce Ramsey's testimony. If the State elects to retry Marston on counts 2 and 6, he may raise that issue in the trial court.

Affirmed in part, reversed in part, and remanded.

WE CONCUR:

Díaz, J.